UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. |
| $1,762,784.74 IN FUNDS SEIZED FROM WELLS FARGO ADVISORS ACCOUNT ENDING IN 2338; | ) |
| $58,196.31 IN FUNDS SEIZED FROM INTERNATIONAL FINANCE BANK ACCOUNT ENDING IN 1263; | ) |
| A RAYTHEON HAWKER 800 FIXED WING MULTI-ENGINE AIRCRAFT, TAIL NUMBER #N304AT, SERIAL NUMBER 258257; | ) |
| A 100 FOOT 2014 FERRETTI YACHT NAMED "NAVIGANTE," HULL #745513; | ) |
| AND | ) |
| AN 82-FOOT 2015 PERSHING YACHT NAMED "PANACEA," HULL #XFAP8207H415 | ) |
| Defendants. | ) |

**VERIFIED COMPLAINT FOR FORFEITURE**

COMES NOW, Plaintiff the United States of America, by and through its attorneys, Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Stephen Casey and

1

Kyle T. Bateman, Assistant United States Attorneys for said district, and for its Verified Complaint for Forfeiture states as follows:

## NATURE OF THE ACTION

1. This is a civil action *in rem* brought by the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), seeking forfeiture of all right, title, and interest in the above-captioned defendant property, which is property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957 and/or 1960, or is property traceable to such property.

2. The defendant property is described more fully as:

   A. $1,762,784.74 in funds seized from Wells Fargo Advisors account ending in 2338 (the "Wells Fargo Advisors Account Funds");

   B. $58,196.31 in funds seized from International Finance Bank account ending in 1263 (the "IFB Account Funds");

   C. A Raytheon Hawker 800 fixed wing multi engine aircraft, Tail number #N304AT, Serial number 258257 (the "Plane");

   D. A 100 foot 2014 Ferretti Yacht named "Navigante," Hull #745513 (the "Navigante Yacht"); and

   E. An 82 foot 2015 Pershing Yacht named "Panacea," Hull #XFAP8207H415 (the "Panacea Yacht").

3. As explained more fully below, Hjalmar Gibelli-Gomez ("Gibelli") and Fabrizio Della Polla De-Simone ("Della Polla") have consented to the forfeiture of the Wells Fargo Advisors Account Funds, the IFB Account Funds, the Plane, the Navigante Yacht and the Panacea Yacht due to the fact that this defendant property was involved in an unlicensed money

transmitting business wherein Venezuelan bolivars were exchanged for U.S. dollars ("USD") on the black market currency exchange in violation of 18 U.S.C. § 1960. Gibelli and Della Polla used the criminal proceeds to further promote the unlicensed money transmitting business, including by sending funds to and from the United States and a place outside the United States, and to conduct financial transactions to conceal or disguise the nature, location, source, ownership and/or control of the proceeds, all in violation of 18 U.S.C. § 1956. Gibelli and Della Polla further used the criminal proceeds to conduct monetary transactions in an amount greater than $10,000 in violation of 18 U.S.C. § 1957. As such, the defendant property, including the Wells Fargo Account Funds, the IFB Account Funds, the Plane, the Navigante Yacht and the Panacea Yacht, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957 and/or 1960, or as property traceable to such property.

4. Gibelli and Della Polla, who are the only known potential claimants to the defendant property, have consented to the forfeiture of the defendant property.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331, 1345, and 1355 because this is a civil action arising under the laws of the United States, because it is a proceeding of forfeiture, and because it has been brought by the United States.

6. This Court has jurisdiction over the parties pursuant to 28 U.S.C. §§ 1345 and 1355 because this is a proceeding for forfeiture, and because it has been brought by the United States.

7. Venue is proper in the Eastern District of Missouri pursuant to 28 U.S.C. § 1355 because an act giving rise to the forfeiture occurred in the Eastern District of Missouri.

## STATUTORY FRAMEWORK

8. Title 18, United States Code, Section 1956(a)(1)(A) provides that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity, commits a federal crime.

9. Title 18, United States Code, Section 1956(a)(1)(B) provides that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of specified unlawful activity, commits a federal crime.

10. Title 18, United States Code, Section 1956(a)(2) provides that whoever transports, transmits, or transfers, or attempts to transport, transmit or transfer a monetary instrument or funds to the United States from a place outside the United States (or from the United States to a place outside the United States) with either (A) the intent to promote the carrying on of a specific unlawful activity or (B) knowing that the funds represent the proceeds of some form of unlawful activity and knowing that such transfer is designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of such proceeds, commits a federal crime.

11. Title 18, United States Code, Section 1957 provides that whoever, within the United States, knowingly engages or attempts to engage in a monetary transaction in criminally derived

property of a value of greater than $10,000 that is derived from specified unlawful activity commits a federal crime.

12. The term "specified unlawful activity" is defined at Title 18, United States Code, Section 1956(c)(7)(A) to include, among other things, violations of Title 18, United States Code, Section 1960.

13. Title 18, United States Code, Section 1960 provides that whoever conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business commits a federal crime. Section 1960 defines an "unlicensed money transmitting business" as one "which affects interstate or foreign commerce in any manner or degree and (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable; (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31; or (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." Section 1960 further defines "money transmitting" to include the transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.

14. The majority of States require money transmitting businesses to obtain a license and comply with other regulatory requirements that apply to such licensed entities, and punish the unlicensed operation of a money transmitting business as a misdemeanor or felony. For example, the State of Missouri requires money transmitters to register with the State. The Sale of Checks

Law, Mo. Rev. Stat. § 361.700 *et seq.* requires that any person within the State of Missouri issuing checks for consideration must obtain a license from the Director of Finance. Mo. Rev. Stat. § 361.705. Section 361.700(2) defines "check" to include "any electronic means of transmitting or paying money." Before a license can be issued to an applicant, the director must "investigate[] and determine whether the character, responsibility, and general fitness of the principals of the applicant or any affiliates are such as to command confidence and warrant belief that the business of the applicant will be conducted honestly and efficiently and that the applicant is in compliance with all other applicable state and federal laws." Mo. Rev. Stat. § 361.715.

15. Title 31, United States Code, Section 5330 also requires any person who owns or controls a money transmitting business to register that business with the Secretary of the Treasury, through the Financial Crimes Enforcement Network (FinCEN). This registration requirement applies in addition to any State licenses that may be required. 31 U.S.C. § 5330(a)(3). Federal regulations require money transmitting businesses not in existence as of December 31, 2001 to register with the Financial Crimes Enforcement Network of the United States Department of Treasury ("FinCEN") within 180 days after the date the business was established. Such registration requires the name and location of the business and the name and address or each person who owns or controls the business, is a director or officer of the business, or otherwise participates in the conduct of the affairs of the business.

16. As defined in 31 U.S.C. § 5330(d)(1), a money transmitting business means any business other than the United States Postal Service which:

> (A) provides check cashing, ***currency exchange***, or ***money transmitting or remittance services***, or issues or redeems money orders, travelers' checks, and other similar instruments or any

6

> other person who engages as a business in ***the transmission of funds***, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions systems;
>
> (B)  is required to file reports under section 5313; and
>
> (C)  is not a depository institution (as defined in section 5313(g)).

Pursuant to 31 U.S.C. § 5313:

> (a)  When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identity the person for whom the transaction is being made.

As defined in 31 C.F.R. § 103.11(n)(3), a financial institution includes a "money services business" as that term is defined in paragraph (uu).

17.  Title 31, Code of Federal Regulations, Section 103.11(uu), defines a money services business as each agent, agency, branch or office within the United States of any person doing business, whether or not on a regular basis or as an organized business concern in one or more of six capacities, which includes a money transmitter. 31 C.F.R. § 103.11(uu)(5)(i) defines a money transmitter as:

> (A)  Any person, whether or not licensed or required to be licensed, who engages as a business in accepting currency, or funds denominated in currency, and transmits the currency or funds, or the value of the currency or funds, by any means through a

7

      financial agency or institution, a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both, or an electronic funds transfer network; or

  (B) Any other person engaged as a business in the transfer of funds.

18. Pursuant to Title 18, United States Code, Section 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957, or 1960 of Title 18, or any property traceable to such property, is subject to civil forfeiture.

## FACTS GIVING RISE TO FORFEITURE

<u>The Venezuela CADIVI System</u>

19. Historically, many Venezuelan citizens have sought to protect their wealth from local economic, political and social factors by converting it to more stable banking systems in Europe and the United States. To avoid a flight of capital, the Venezuelan government has restricted the outflow of funds from their financial systems by imposing numerous barriers on currency exchange. In recent years, the Venezuelan government has enacted various policies and regulations which make the transfer of funds out of Venezuela difficult and complex.

20. In February 2003, Venezuela enacted currency exchange controls which fixed the exchange rate of the Venezuelan bolivar to the USD at a rate controlled by the Venezuelan government's Foreign Exchange Commission, or Comisión de Administración de Divisas ("CADIVI"). CADIVI is a government entity managed by the Venezuelan Finance Ministry with authority to regulate and impose restrictions on foreign currency exchange rates and the procedures used to obtain foreign currencies. CADIVI has the authority to sell USD to individuals and corporations for limited use purposes that include the purchase of products or imports for certain

industries, and other limited purposes identified by the government. USD sold by CADIVI has a preferential exchange rate. CADIVI maintains tight control of the outflow of USD from Venezuela's Central Bank and the certification process to exchange bolivars to USD is strict and bureaucratic.

21. The use of off-shore entities makes it difficult to trace the source and destination of these transactions. Many of these off-shore entities are located in jurisdictions with strong bank secrecy laws. Common off-shore locations include Antigua and Barbuda, Panama, the Bahamas, Barbados, the British Virgin Islands, the Cayman Islands, and Netherlands Antilles. Verifying the true ownership of the off-shore company and source funds in such transactions is very difficult in light of these considerations, creating an inherent risk for United States banks which allow their customers to participate in such transactions. Registration of money transmitting businesses such as the one described below would require records to be kept and reports to be made that might provide transparency as to the nature of those transactions; conversely, the failure to register permits such businesses and their customers to conceal the true source and nature of those transactions.

The Unlicensed Money Transmitting Business and the Wells Fargo Account Funds

22. Della Polla and Gibelli are both Venezuelan nationals who currently reside in Venezuela.

23. Della Polla was the majority owner of Servinaca, C.A ("Servinaca"), a poultry farm in Venezuela that was approved for payment by the CADIVI. Another individual who conspired with Della Polla and Gibelli in the below described unlicensed money transmitting scheme (hereinafter referred to as the "co-conspirator") also had a partial ownership interest in Servinaca.

9

24. Gibelli is the president of Resguarda Sociedad De Corretaje De Seguros C.A. ("Resguarda"), an insurance company based in Venezuela. At all times relevant to this complaint, Resguarda maintained a brokerage account ending in 2338 with Wells Fargo Advisors, based in St. Louis, Missouri (the "Wells Fargo Account"). The Wells Fargo Account is an "enhanced" brokerage account that combines investing and financial management features. Gibelli is the sole signatory for the Wells Fargo Account.

25. Neither Della Polla, Gibelli, Resguarda nor the co-conspirator are registered with the Financial Crimes Enforcement Network (FinCEN) or licensed with any State to operate as a money transmitting business.

26. Della Polla and others submitted false and inflated invoices by and through Servinaca in order to obtain USD at a preferred rate from the CADIVI. The USD released by the CADIVI was wired to, *inter alia*, accounts controlled by the co-conspirator. Della Polla and others sold the USD received by the CADIVI through the black market currency exchange to third parties, including to Gibelli. Specifically, Gibelli received more than $11 million USD as part of this black market exchange since approximately October 2011.

27. Investigators have interviewed Gibelli. Gibelli admitted that he purchased and sold USD by and through the Wells Fargo Account as part of the black market exchange of Venezuelan bolivars and USD. Gibelli further confirmed that he purchased approximately $11 million USD in transactions that were facilitated by Della Polla and the co-conspirator.

28. A review of the Wells Fargo Account shows that between approximately October 2011 and April 2015, there were more than 650 wire transactions occurring within the Wells

10

Fargo Account, including $173 million in wire transfers in and $160 million in wire transfers out of the Wells Fargo Account. Gibelli admitted that the majority of these transactions were related to the purchase and sale of USD on the Venezuelan black market currency exchange.

29. On or about October 28, 2016, the United States seized $1,762,784.74 in U.S. currency from the Wells Fargo Account (the "Wells Fargo Account Funds") pursuant to a federal seizure warrant as funds that were involved in a violation of 18 U.S.C. §§ 1956, 1957 and/or 1960.

30. On or about September 29, 2017, Gibelli signed a written consent to the forfeiture of the Wells Fargo Account Funds, both in his individual capacity and in his capacity as President and authorized representative of Resguarda.

The IFB Account Funds

31. Gibelli also maintained an account ending in 1263 held in his name at International Finance Bank (the "IFB Account").

32. Between January 25, 2012, and March 25, 2014, Gibelli made nine wire transfers totaling $4,988,000 from the Wells Fargo Account to the IFB Account. Each of these nine transfers exceeded $10,000.

33. On or about October 28, 2016, the United States seized $58,196.31 in U.S. currency from the IFB Account (the "IFB Account Funds") pursuant to a federal seizure warrant as funds that were involved in a violation of 18 U.S.C. §§ 1956, 1957 and/or 1960.

34. On or about September 29, 2017, Gibelli signed a written consent to the forfeiture of the IFB Account Funds.

The Plane

35.     On or about July 12, 2012, Gibelli purchased the Plane for approximately $1.8 million using funds from the IFB Account. The funds used to purchase the Plane were wired to Insured Aircraft Title Service as follows: $100,000 on or about June 27, 2017; and $1,706,104.50 on or about August 13, 2012. Both wires referenced "tail #N304AT."

36.     The Plane was purchased in the name of Sky Aviation Holding Corp. ("Sky Aviation"), a Delaware corporation that was formed by Gibelli on or about June 28, 2012. Gibelli controls Sky Aviation, and has represented to the United States that he has sole discretion to take action regarding the Plane.

37.     On September 27, 2012, Gibelli transferred $3,500 from the IFB Account to open another IFB account ending in 7779 in the name of Sky Aviation (the "Sky Account").

38.     In approximately August 2012, Gibelli, through Sky Aviation, applied for a three-year, $1.3 million loan from International Finance Bank (the "Sky Loan"). The stated purpose of the Sky Loan was "to replenish borrower's cash position which was originally used to purchase a 1994 Hawker 800 aircraft."

39.     Between approximately December 2012 and March 2015, Gibelli wired more than $1,892,000 from the Wells Fargo Account to the Sky Account. Many of these wire transactions have a notation of being for payment of aviation expenses, and some were used to make payments on the Sky Loan.

40.     In addition, between approximately August 2012 and April 2013, Gibelli wired more than $130,000 from the Wells Fargo Account to Jetset Aircraft Interiors, based in Florida, to customize the interior of the Plane.

41. On or about October 26, 2016, the United States seized the Plane pursuant to a federal seizure warrant as traceable to funds that were involved in a violation of 18 U.S.C. §§ 1956, 1957 and/or 1960.

42. On or about September 29, 2017, Gibelli signed a written consent to the forfeiture of the Plane, both in his individual capacity, and in his capacity as authorized representative of Sky.

The Navigante Yacht

43. Between July 2013 and February 2014, Gibelli transferred $2,486,525 from the Wells Fargo Account to Ferretti Group of America, a luxury yacht sales company with offices in Fort Lauderdale, Florida, to purchase the Navigante Yacht.

44. The funds were transferred in the following three separate wire transactions: $1,500,000 on or about July 23, 2013; $500,000.00 on or about November 26, 2013; and $486,525.00 on or about February 21, 2014. A notation on the third wire states, translated from Spanish: "Final payment boat purchase 100 custom line."

45. Related to these transactions, Gibelli spoke with a representative of Wells Fargo Advisors on or about February 20, 2014, and stated that he was in Miami, Florida, closing on a purchase of a new yacht.

46. Additionally, on August 30, 2013, Gibelli sent a wire from the IFB Account in the amount of $4.5 million to Ferretti Group. This wire had a notation, again in Spanish, for: "payment for custom line, 100, Hjalmar Gibelli/Optimal Marine Ventures Ltd."

47. The Navigante Yacht is registered to Optimal Marine Venture Ltd. Incorporated, an entity based in the British Virgin Islands ("OMV"). Gibelli is one of the principal directors,

shareholders and beneficial owners of OMV, and has represented to the United States that he has sole discretion to take action regarding the Yacht.

48. On or about September 11, 2017, the Yacht was restrained by law enforcement in the Dutch territory of Bonaire, and was subsequently moved to the United States.

49. On or about September 29, 2017, Gibelli signed a written consent to the forfeiture of the Yacht, both in his individual capacity and in his capacity as the controlling director, beneficial owner, and authorized representative of OMV.

The Panacea Yacht

50. On or about December 19, 2014, Della Polla purchased the Panacea Yacht from the Ferretti Group for $6,880,445. As part of the transaction, Della Polla received a $2.6 million trade allowance for another yacht. The remaining purchase price of $3,839,517.63 was paid as follows: $2.7 million was financed through a loan obtained by Della Polla, and $1,139,517.63 was paid from a line of credit obtained by a co-conspirator to Della Polla's unlicensed money transmitter operation.

51. On December 17, 2014, Della Polla's co-conspirator obtained a $1.87 million line of credit against a condominium located in New York (the "Condo") to help finance the purchase of the Panacea Yacht. On December 19, 2014, the settlement agent who received disbursement from the line of credit wired $1,139,517.63 to Ferreti Group related to the purchase of the Panacea Yacht.

52. The Condo was purchased for $2,575,000 on February 1, 2012, but the closing did not occur until on or about March 15, 2013. As part of this transaction, a $257,500 down payment was paid from a corporate account controlled by Della Polla, and which Della Polla used to receive

14

funds from the aforementioned unlicensed money transmitter business scheme. The balance due at closing was also paid by another corporation controlled by Della Polla that had also received funds from the aforementioned unlicensed money transmitter business scheme.

53. Della Polla failed to pay off the line of credit against the Condo. In September 2015, the Condo was sold for $3.8 million, and the proceeds were used to pay off the line of credit.

54. In sum, Della Polla and a co-conspirator used funds from the aforementioned unlicensed money transmitter business to purchase the Condo. Della Polla and the co-conspirator then used the Condo to obtain a line of credit in order to purchase the Panacea Yacht.

55. The Panacea Yacht is registered to La Barca II N.V., a corporation owned and controlled by Della Polla. The Yacht is flagged in Barbados and was moored in Miami, Florida.

56. On or about October 28, 2016, the United States seized the Panacea Yacht pursuant to a federal seizure warrant as proceeds of, or involved, in a violation of 18 U.S.C. §§ 1956, 1957 and/or 1960.

57. On or about November 30, 2017, Della Polla signed a written consent to the forfeiture of the Panacea Yacht, both in his individual capacity and in his capacity as authorized representative of La Barca II N.V.

### Count I – Forfeiture as Property Involved in Money Laundering
### 18 U.S.C. § 981(a)(1)(A)

58. Each of the foregoing allegations is hereby incorporated by reference as if fully set forth herein.

59. Gibelli, Della Polla, the co-conspirator and others operated an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, and used the proceeds to promote the

carrying on of the unlicensed money transmitting business (including by sending funds to and from the United States to a place outside the United States), and to conduct financial transactions to conceal or disguise the nature, location, source, ownership and/or control of the proceeds, all in violation of 18 U.S.C. § 1956.  Gibelli, Della Polla, the co-conspirator and others further used the criminal proceeds from the unlicensed money transmitting business to conduct monetary transactions in an amount greater than $10,000 in violation of 18 U.S.C. § 1957.

60.   As such, the defendant property, including the Wells Fargo Account Funds, the IFB Account Funds, the Plane, the Navigante Yacht and the Panacea Yacht, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957 and/or 1960, or as property traceable to such property.

### PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the defendant properties as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the defendant properties be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: December 22, 2017

Respectfully submitted,

JEFFREY B. JENSEN
United States Attorney

*/s/ Kyle T. Bateman*
KYLE T. BATEMAN, #996646DC
STEPHEN CASEY, #58879MO
Assistant United States Attorneys
111 South 10th Street, Suite 20.333
Saint Louis, Missouri 63102
Telephone:  (314) 539-2200
Facsimile:   (314) 539-2777

## VERIFICATION

I, Matt McKnight, hereby verify and declare under penalty of perjury that I am a Special Agent with the Drug Enforcement Administration, that I have read the foregoing Verified Complaint and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with the Drug Enforcement Administration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 15 December 2017
(date)

_Matt McKnight_
Matt McKnight
Special Agent
Drug Enforcement Administration